# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ANTHONY SMITH, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
|     v. | )   No. 12 C 509 |
| | ) |
| CHICAGO POLICE OFFICERS T. RAMIREZ, | ) |
| I. RAMOS, I. VALENTIN, and | ) |
| R. VILLACIS and the CITY OF | ) |
| CHICAGO, | ) |
| | ) |
|     Defendants. | ) |

## **MEMORANDUM OPINION**

Before the court is the plaintiff's motion for summary judgment on Counts I, II, and V of the First Amended Complaint. For the reasons explained below, the motion is denied.

## **BACKGROUND**

This is a civil rights action pursuant to 42 U.S.C. § 1983 brought by Anthony Smith against the City of Chicago and Chicago police officers Tony Ramirez, Ivan Ramos, Israel Valentin, and Ricky Villacis. It arises out of Smith's July 7, 2010 arrest for drinking alcoholic liquor on a public way, resisting a peace officer, and aggravated assault to a police officer. On that date at about 11:00 p.m., Smith was standing with a group of

approximately five to ten[1] "dark-skinned" African-American or Latino men on the sidewalk near the corner of Humboldt Boulevard and Wabansia Avenue in Chicago. (Defs.' Resp. to Pl.'s R. 56.1 Statement ¶¶ 15, 17.) The four defendants, who were part of a special "saturation team" of officers patrolling an area that included the intersection of Humboldt and Wabansia, drove by in a police car and saw that at least some of the men standing near the corner were holding clear plastic cups containing clear liquid. Some of the officers believed that the individuals in the group might be drinking alcohol. According to Villacis, the group was engaged in loud conversation. According to Villacis and Ramos, some people in the group "bladed" their stance as the officers drove by. (The officers describe the act of "blading" one's stance as, generally, a turning of one's body to the side in an attempt to hide something that one is holding or carrying.) The officers did not stop at the scene, but did return ten to twenty minutes later.

Upon their return, the officers observed that the men with plastic cups were still on the sidewalk at Humboldt and Wabansia. They stopped their car and got out. According to the officers, as they approached the group, some people in the group "chugged" their

---

[1] This is a rough estimate, drawn from the defendants' deposition testimony. It is undisputed that the defendants saw "four to possibly more than ten people" in the group. (Defs.' Resp. to Pl.'s R. 56.1 Statement ¶ 17.) But it is also undisputed that upon their return to the scene, the defendants detained four people in the group while other group members walked away, Defs.' Resp. to Pl.'s R. 56.1 Statement ¶ 39, so there must have been more than four people in the group, at least when the defendants returned to the scene.

drink and/or dropped or threw their cup on the ground, and some walked away from the scene. The officers detained and arrested four of the men, including plaintiff, for drinking on the public way in violation of Chicago Municipal Code § 8-4-030. The details of plaintiff's arrest will be discussed below.

Plaintiff alleges that Ramirez[2] used excessive force against him when patting him down against the police car and that the other officers failed to intervene. He also alleges that all four defendant officers battered him at Chicago's 14th District police station and that one or more of the officers used a taser on him. (The excessive force allegations are not pertinent to the instant motion.)

In addition to the drinking charge, plaintiff was charged with resisting a peace officer and aggravated assault to a police officer. Ramirez and Villacis signed the criminal complaints. Plaintiff was tried on the resisting and assault charges; after Ramirez testified at the trial, the state-court judge granted plaintiff's motion for directed findings of not guilty. The drinking charge was non-suited by the City of Chicago, so it was not decided on the merits.

---

[2] Plaintiff states in his response to defendants' Rule 56.1 Statement that paragraph 9 of the First Amended Complaint is incorrect in referring to Ramos as having performed a patdown of plaintiff; the correct allegation should be that Ramirez performed the patdown. (Pl.'s Reply to Defs.' R. 56.1 Statement, ¶¶ 28-30.) Plaintiff is given leave to file a Second Amended Complaint by August 22, 2014 to correct the error.

The First Amended Complaint asserts claims for § 1983 unlawful seizure against the officer defendants (Count I); § 1983 false arrest against Villacis and Ramirez (Count II); § 1983 excessive force against the officer defendants (Count III); § 1983 failure to intervene against the officer defendants (Count IV); state-law malicious prosecution against Villacis and Ramirez (Count V); and state-law indemnification against the City (Count VI).

Plaintiff moves for summary judgment on Counts I, II, and V.

## DISCUSSION

### I. Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Kvapil v. Chippewa County, Wis., 752 F.3d 708, 712 (7th Cir. 2014). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)); see also Bunn v. Khoury Enters.,

Inc., 753 F.3d 676, 682 (7th Cir. 2014). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." McGrath v. Gillis, 44 F.3d 567, 569 (7th Cir. 1995).

## II. Counts I and II (Unlawful Seizure and False Arrest)

Counts I and II are Fourth Amendment claims. Count I is a claim against all of the officer defendants for illegal seizure. Plaintiff contends that the defendants' own version of the events establishes that they lacked a reasonable suspicion to stop and detain him for purposes of investigating whether he was violating § 8-4-030 or committing any other offense and that they lacked a reasonable suspicion to frisk him. With the exception of plaintiff's affidavit in which plaintiff states where he was standing and attaches the photographs of the area around the intersection of Humboldt and Wabansia that plaintiff represents accurately portray the area as it appeared in July 2010,[3] plaintiff's motion does not rely on his version of the events.

---

[3] In the affidavit, plaintiff states that when the officers arrived, he was "standing on the sidewalk inside the gate" that leads into the courtyard of the apartment building on the northwest corner of Humboldt and Wabansia. (Pl.'s R. 56.1 Statement, Ex. H, Aff. of Anthony Smith ¶ 4.) Smith also states that he was "standing behind the third car north of Wabansia behind the gate of the apartment building." (Smith Aff. ¶ 6.) He does not contend, however, that he was not standing on a public way.

**A.  Terry Stops and Arrests**

Police officers may conduct an investigatory stop of a person, commonly referred to as a Terry stop, "when they have a reasonable, articulable suspicion that criminal activity is afoot."  United States v. Lawshea, 461 F.3d 857, 859 (7th Cir. 2006) (citing Terry v. Ohio, 392 U.S. 1, 30 (1968) and United States v. Breland, 356 F.3d 787, 791 n.1 (7th Cir. 2004)); see also United States v. Snow, 656 F.3d 498, 503 (7th Cir. 2011).  "While 'reasonable suspicion' is a hard term to define precisely, the Supreme Court has held that it is a commonsense, nontechnical concept that deals with the factual and practical considerations of 'everyday life on which reasonable and prudent people, not legal technicians, act.'" Lawshea, 461 F.3d at 859 (brackets omitted).  Although "reasonable suspicion" is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, "the Fourth Amendment requires at least a minimal level of objective justification for making the stop."  Id. (citing Illinois v. Wardlow, 528 U.S. 119, 123 (2000)).  "In other words, reasonable suspicion is less than probable cause but more than a hunch."  Id.

> In assessing the reasonableness of a Terry stop, the facts are judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search warrant a man of reasonable caution in the belief that the action taken was appropriate?  The reasonableness of a particular stop depends in turn on the extent of the intrusion on the rights of the individual as well as on the reason for the restraint. .

> . . . The totality of the circumstances controls. The process does not deal with hard certainties, but with probabilities.

United States v. Tilmon, 19 F.3d 1221, 1224 (7th Cir. 1994) (citations and internal quotation marks omitted). "[C]ertain behavior in isolation may have an innocent explanation yet that same behavior may give rise to reasonable suspicion when viewed in the context of other factors at play." Lawshea, 461 F.3d at 859.

In Tilmon, the Seventh Circuit also observed:

> In the recent past, the permissible reasons for a stop and search and the permissible scope of the intrusion [under the Terry doctrine] have expanded beyond their original contours. The last decade has witnessed a multifaceted expansion of Terry, including the trend granting officers greater latitude in using force in order to 'neutralize' potentially dangerous suspects during an investigatory detention. For better or for worse, the trend has led to the permitting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention.

19 F.3d at 1224-25 (citations and internal quotation marks omitted); see also United States v. Burton, 441 F.3d 509, 512 (7th Cir. 2006).

Count II is a claim against Villacis and Ramirez for false arrest (Villacis for handcuffing plaintiff and Ramirez for the patdown). Plaintiff maintains that Villacis and Ramirez lacked probable cause to arrest him because they did not have sufficient facts at the time to permit a prudent person to believe that he had committed an offense. Probable cause is an absolute defense to a

claim of arrest in violation of the Fourth Amendment, so in order to prevail, a plaintiff must show that he was arrested without probable cause. Gonzalez v. City of Elgin, 578 F.3d 526, 537 (7th Cir. 2009). "A police officer has probable cause to arrest a person if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. In ascertaining whether an officer had probable cause, the court is to view the circumstances from the perspective of a reasonable person in the position of the officer. The jury must determine the existence of probable cause if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. Only if the underlying facts claimed to support probable cause are not in dispute may the court decide whether probable cause exists." Id. (citations, ellipsis, and internal quotation marks omitted).

"Subtle, and perhaps tenuous, distinctions exist between a Terry stop, a Terry stop rapidly evolving into an arrest and a de facto arrest. For example, probable cause may be required when police restraint is so intrusive that, while not technically an arrest, it may be tantamount to an arrest. Given the endless variations in the facts and circumstances, there is no litmus-paper test for determining when a seizure exceeds the bounds of an

investigative stop and becomes an arrest." Tilmon, 19 F.3d at 1224 (citations and internal quotation marks omitted); see also United States v. Bullock, 632 F.3d 1004, 1016 (7th Cir. 2011).

Under Chicago Municipal Code § 8-4-030, it is unlawful for any person "to drink any alcoholic liquor as defined by law on any public way . . . in the city." "'Public way' means any sidewalk, street, alley, highway, or other public thoroughfare." Chicago Municipal Code § 1-4-090(f). Thus, for the defendants to have had a proper basis for conducting a Terry stop of plaintiff, they needed a reasonable suspicion that plaintiff was drinking liquor on a public way. To have properly arrested plaintiff for the offense, the facts and circumstances within the arresting officer's knowledge must have been sufficient to warrant the reasonable belief that plaintiff had been drinking liquor on a public way. Plaintiff was standing on a sidewalk and does not dispute that he was standing on a public way, so the issues are whether there was a reasonable suspicion that he was drinking liquor and whether there was probable cause to arrest him for doing so.

**B. The Officers' Testimony**

Plaintiff asserts that "[it] is obvious that the Defendants, nearing the end of their shift and having made no arrests, engaged in racial profiling when they saw a group of African[-]American and Latino men. The Defendants decided to stop them, make up a pretext to search them and hopefully, find weapons or drugs." (Pl.'s Mem.

in Supp. of Mot. at 4.) But plaintiff fails to acknowledge several significant facts and circumstances existing before the Terry stop and arrest about which the officer defendants testified at their depositions. Those facts and circumstances are as follows:

- On July 7, 2010, around 11:00 p.m., the officers were patrolling an area known for gang activity (Ramos 94-96; Villacis 108, 111-114; Valentin 103-105; Ramirez 61-63) and narcotics activity. (Ramirez 61-63)

- The first time the officers drove by, they saw a group of men on the corner of Humboldt and Wabansia talking loudly and drinking from plastic cups (Villacis 54, Valentin 99); the officers thought and/or remarked that the people in the group might be drinking liquor. (Villacis 108; Valentin 100-102)

- In two of the officers' experience, when a group of people is standing around drinking from plastic cups, those people are often drinking liquor. (Villacis 49-51, 53; Valentin 100)

- The first time the officers drove by, a number of men in the group took a "bladed stance" and tried to hide what they were holding. (Ramos 77; Villacis 118)

- When the officers returned, plaintiff was still there (Valentin 112) on the sidewalk (Villacis 173-74); the group members still had cups and were drinking. (Ramos

86)

- Plaintiff was the loudest member of the group. (Valentin 112)

- When the officers stopped and got out of their car, plaintiff was standing on the sidewalk drinking from a cup with liquid in it. (Villacis 25-26, 190; Valentin 246)

- As the officers got out of their car and approached the group to see what was going on and investigate the drinking (Villacis 121; Valentin 128), a number of men in the group bladed their stance to hide their cups (Ramos 86-88; Valentin 117-118, 145; Ramirez 47); plaintiff also bladed his stance to hide his cup (Valentin 248; Ramirez 41); many "chugged" or finished their drinks (Ramos 34, 87) and many dropped their cups. (Ramos 26, 31, 34, 98; Ramirez 52)

- As the officers approached plaintiff, plaintiff dropped his cup and tried to walk away (Villacis 127-128; Valentin 139-140, 247; Ramirez 41, 56-57, 65); liquid came out of plaintiff's cup when it was dropped/thrown. (Valentin 249)

- As the officers approached plaintiff, Valentin noticed that plaintiff was sweating (Valentin 247); the officers smelled alcohol on plaintiff's breath

(Villacis 94, Valentin 146); the officers could smell alcohol on other group members' breaths too (Valentin 128; Ramirez 105-107);[4] plaintiff "looked inebriated." (Ramirez 105)

- As the officers approached plaintiff, plaintiff took an aggressive stance, "puffing out" his chest and putting out his arms and asking, "What the fuck do you guys want?" (Villacis 94, 99-100, 191-192) and "Why are you guys fucking with me?" (Valentin 137-138)

- Plaintiff "reeked" of alcohol, slurred his words, and acted aggressively. (Valentin 139)

(Defs.' R. 56.1 Statement of Additional Facts, Ex. A, Dep. of Ivan Ramos; Ex. B, Dep. of Ricky Villacis; Ex. C, Dep. of Israel Valentin; and Ex. D, Dep. of Tony Ramirez.)

## C. A Material Issue of Fact Exists

There is no dispute that this was a Terry stop that quickly evolved into an arrest. It is undisputed that shortly after getting out of the squad car and approaching the plaintiff, Villacis handcuffed and arrested the plaintiff and told him that he

---

[4] Plaintiff insists that vodka is odorless and therefore indistinguishable "in appearance" from water (Pl.'s Mem. in Supp. of Mot. at 3; Pl's R. 56.1 Statement ¶ 68; Pl.'s Reply to Defs.' R. 56.1 Statement ¶ 32.) In support of this purported "fact," plaintiff submits United States Treasury Department Industry Circular No. 68-4, issued in 1968, that gave notice of proposed changes in federal regulations for distributors of distilled spirits. The Circular refers to vodka as a "neutral spirits product without distinctive character aroma." (Pl.'s Am. Ex. N.) Being "without distinctive character aroma," however, is not equivalent to being completely odorless.

was under arrest, without asking him any questions. (Defs.' Resp. to Pl.'s R. 56.1 Statement ¶¶ 58, 62, 63; 76-77.) According to the officers, however, they observed the above-listed circumstances prior to the stop and/or arrest.[5] Thus, plaintiff is simply incorrect that "[t]he evidence that the Plaintiff was drinking alcohol on the public way is based . . . solely on an unrecovered plastic cup containing a clear liquid." (Pl.'s Mem. in Supp. of Mot. at 10.) Given the totality of the circumstances and the reasonable inferences that may be drawn from it, and that the court views the facts in the light most favorable to defendants as the non-moving parties, there is sufficient evidence to create a genuine issue of material fact as to whether the officers had reasonable suspicion to believe that plaintiff was drinking on the sidewalk and whether there was probable cause to arrest him for that offense. According to the officers, they drove by a corner in

---

[5]/ Defendants also point to testimony that Ramos, as he exited the police car, saw one group member put a bottle down on the ground by a nearby fence (Ramos 28, 85) and that it was a bottle of Grey Goose vodka with some liquid still in it (Valentin 32-33; Ramos 26). This evidence is relevant to the existence of reasonable suspicion for the Terry stop, but not to the existence of probable cause for the arrest because there is no evidence that Villacis, the arresting officer, was aware of the presence of the bottle at the time he arrested the plaintiff. Defendants also point to testimony that the officers smelled the cups that were dropped and that they smelled like alcohol (Valentin 249; Ramirez 80), but there is no evidence that any officers picked up the cups and smelled them until after plaintiff was arrested. Facts and circumstances that the officers became aware of only after the arrest do not affect the probable-cause analysis; it is not a "post hoc determination." See United States v. Reed, 443 F.3d 600, 603 (7th Cir. 2006). For the same reason, plaintiff's argument that the doctor who treated plaintiff shortly after his arrest found no evidence of intoxication is irrelevant.

a high-crime area[6] at night and saw a loud group of men standing on the corner drinking from plastic cups, which in their experience is often indicative that the group is drinking liquor;[7] the men attempted to hide the cups; when the officers returned, plaintiff was holding and drinking from a cup, and the men in the group, including plaintiff, attempted to hide the cups and/or dropped or threw them; some men walked away; liquid came out of plaintiff's cup as he dropped it; and plaintiff smelled of alcohol, took an aggressive stance, and was argumentative. That is enough evidence to go to a jury with respect to the existence of reasonable suspicion and probable cause.

Plaintiff's motion is premised on ignoring and questioning a significant amount of defendants' testimony. Plaintiff, for example, maintains throughout his briefs that the officers "invented facts at their depositions to justify the stop and subsequent arrest." (Pl.'s Reply at 1.) He also argues that the arrest and case reports prepared shortly after the arrest "do not document the Defendants' subsequent inventions." (Pl.'s Reply at 2.) But it is well settled that at the summary-judgment stage, the court does not make credibility determinations, weigh evidence, or

---

[6] "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. Accordingly, we have previously noted the fact that the stop occurred in a "high crime area" among the relevant contextual considerations in a Terry analysis." Wardlow, 528 U.S. at 124.

[7] The experience of an officer is a relevant consideration in a Terry analysis. See, e.g., Lawshea, 461 F.3d at 859.

decide which inferences to draw from the facts; those are jury functions. See Gibbs v. Lomas, 755 F.3d 529, 536 (7th Cir. 2014).

One final matter must be addressed. After the briefing of this motion, plaintiff moved for leave to file four additional statements of fact. Defendants objected, arguing that plaintiff waived the facts by failing to include them in his original Rule 56.1 Statement. The court granted plaintiff's motion over defendants' objection and noted that it would take the matter along with the substantive motion. Defendants have responded to the additional facts, and the additional facts do not differ substantially from what was presented in plaintiff's original Rule 56.1 Statement. They do not change the analysis.

Plaintiff's motion for summary judgment on Counts I and II is denied.

### III. Count V (Malicious Prosecution)

In Count V, plaintiff asserts a state-law claim for malicious prosecution. Under Illinois law, lack of probable cause is an essential element of this tort. Reynolds v. Menard, Inc., 850 N.E.2d 831, 837 (Ill. App. Ct. 2006). Because we have found that there is a genuine issue of material fact as to whether there was probable cause to arrest plaintiff for drinking liquor in a public way, plaintiff's motion for summary judgment must also be denied as to Count V.

## **CONCLUSION**

For the reasons explained above, plaintiff's motion for summary judgment on Counts I, II, and V of the First Amended Complaint [60] is denied. A status hearing is set for September 11, 2014 at 8:45 a.m. Plaintiff is given leave to file a Second Amended Complaint by August 22, 2014 to correct his allegation concerning which officer performed the patdown.

DATE:      August 14, 2014

ENTER:    _____
                Amy J. St. Eve, United States District Judge